## Case No. 16,724.

UNITED STATES v. WILLIAMS et al.

[1 Ware, (175) 173.] [1]

District Court, D. Maine. Feb. Term, 1830.

DEMURRER TO EVIDENCE — PAYMENT OF DUTY BONDS—BANK CHECKS—COLLECTOR'S RECEIPT —ESTOPPEL—CANCELLATION OF BOND.

1. In a demurrer to evidence, the party who demurs is held to admit every fact which a

[1] [Reported by Hon. Ashur Ware, District Judge.]

jury, in the exercise of a fair and reasonable discretion, could infer from the evidence, but he is not bound to admit forced and violent inferences.

2. A collector of the customs is not authorized to receive any thing in payment of a duty bond, but the lawful money of the United States, or foreign gold or silver coins, made current by law. If he receives a check upon a bank, this is not payment of the bond until the check is paid.

3. When a general agent is acting under special instructions. which are known to the person with whom he is dealing, he cannot bind his principal by any act which violates his instructions. In such a case there is no difference between the authority of a general and special agent to bind his principal.

4. A receipt of a collector upon a duty bond, acknowledging payment and satisfaction of the bond, does not operate as an estoppel. It is open to explanation, and is no bar to a suit on the bond if it be not paid.

5. The cancellation of a bond does not, per se, destroy it when it is cancelled through fraud or evident mistake, but it may be declared upon as a good and subsisting obligation.

This was a case of demurrer to evidence.

Mr. Shepley, U. S. Dist. Atty.
Mitchell & Randall, for defendants.

WARE, District Judge. The declaration in this case is on a bond alleged to be lost, which is in the penal sum of $10,000. The defendants have pleaded the general issue, non est factum. and also a special plea of payment, and in this plea have set forth the bond with the condition, which is to secure the payment of $739.56, being the amount of duties on certain merchandise imported into the port of Bath, in the brig Elizabeth. The case comes before me on a demurrer to the evidence by the plaintiffs. The effect of a demurrer to evidence is to take the case from the jury, and substitute the court in their place, not only to decide the law, but to determine the facts. This is a course of proceeding to which a party has a right to resort, but it is unusual, and not favored by the courts, because it withdraws the consideration of the evidence from the appropriate tribunal for the decision of all matters of fact. In proceedings at common law the jury are the legal and proper judges of weight of evidence, of the credit of witnesses, and of the force of circumstantial and presumptive proofs, where the effect of presumptions is not settled by the rules of law. When they have ascertained and settled the facts in controversy, it is the office of the court to decide the law. By this proceeding, the jury in the particular case are superseded in their regular and appropriate office, and the whole duty of settling both the law and facts, is referred to the court. If a party chooses to adopt this mode of proceeding, the court will, in a proper case, admit him to his demurrer, but will exact of him, as a condition, a distinct admission, on the record, of every fact which the evidence proves. If the evidence is loose and inde-

terminate, and such as may be pressed with more or less effect upon a jury—or if it consists of circumstances which lead to the belief of other facts beyond those which are directly in proof, the court will require him to admit the truth of the facts which stand on this doubtful or uncertain proof, and the existence of those ulterior facts which the presumptive and circumstantial evidence renders only probable, and which a jury, in the exercise of a reasonable discretion, might either admit or reject. These principles were settled in the case of Gibson v. Hunter, 2 H. Bl. 187–211, the leading case on this subject, and have never since been considered as open to controversy. In the most correct practice, the facts are settled and entered on the record under the immediate direction of the court, and this will usually be required, when insisted on by the adverse party, before the court will require him to join in the demurrer. 2 H. Bl. 187; 2 Tidd, Prac. 794. The facts will then appear stated as in a special verdict, and the court will apply the law to the facts in the same manner in the one case as in the other. If, however, the adverse party joins the demurrer without insisting on the facts being thus previously ascertained and stated, but will refer the whole evidence, in the form in which it is offered in court, to its decision, the court will proceed, in adjudicating upon the case, on the same principles in judging of the evidence as it would in making up the statement of facts before the joinder of the demurrer. It will not go to work critically to ascertain on which side lies the balance of conflicting testimony, nor scrutinize with severity and strictness the credit of witnesses, but will generally take the facts sworn to, as true, so far at least as they make in favor of the party joining the demurrer. It will infer from loose and circumstantial testimony all the facts that could be found by a jury in the exercise of a reasonable and fair discretion. It was argued by the counsel for the defendant that the court is bound to admit every fact which can possibly be inferred by a jury. But this is stating the principle too strongly. The court will not draw such inferences from the evidence as are manifestly unreasonable and capricious. The true rule is stated by Chief Justice Marshall. Pawling v. U. S., 4 Cranch [8 U. S.] 221. "The party demurring admits the truth of the testimony to which he demurs, and all the conclusions of fact which a jury may fairly draw from that testimony, but forced and violent inferences he does not admit."

The facts in this case are not numerous, and few of them are controverted. The defendants, on the 12th of May, were indebted to the United States on the duty bond which is the subject of this action, payable "on or before the 8th of June" to the collector of the port of Bath for the time being. In the month of April, Mr. Swanton, the collect-or, was removed from office, and Mr. King appointed in his place. Mr. Swanton was notified of his removal, by a letter from the comptroller of the treasury, dated April 26, and ordered to deliver all the public property in his hands to his successor, on his application. Mr King did not apply for it until the 15th of May, and Swanton continued to act as collector till the close of that day. On the 12th of May the defendant called for his bond, due the 8th of June. It was cancelled by J. B. Swanton, Jr., the deputy collector, and delivered to him, and the deputy received a check on the Lincoln Bank in payment, and gave him a receipt in full for the bond. There is no certain proof whether this check was in the common form, or was a memorandum check. Swanton says he preferred memorandum checks, because the bank would pay them only to the payee named in the check, and would not pay to the bearer. But in the absence of positive proof, as the court is bound to make every reasonable inference from the evidence in favor of the defendants, this may be presumed to be a check in the ordinary form, payable, on demand at the bank, to the bearer. It must also be presumed that it was received by the deputy collector as payment and satisfaction of the bond. It was never presented at the bank, but the collector having kept it in his possession for several weeks, it was returned to the drawer, who gave him, in exchange, his promissory note payable to the collector. Swanton says he thinks this note was payable to his order, but is not certain; but according to another witness, Williams, the maker, declared it was not payable to order. This note Swanton assigned to Riggs, one of the sureties, as an indemnity for his liability on his bond, some time in the latter part of June, or the beginning of July, and of course after the duty bond became payable. It was also proved that duty bonds in that office were usually paid by checks on the bank.

Such are the material facts in the case. The question whether Swanton, after he was notified of his removal, and of the appointment of his successor, could legally act as collector until his successor was qualified and took possession of the office, and whether his acts within that period were binding on the United States, was waived at the argument, and it was assumed on the one side, and not contested on the other, that Swanton was, during this time, collector de jure as well as de facto. The question which has been elaborately and learnedly argued at the bar is, admitting Swanton to have had the authority to act as collector until his successor took possession of the office, whether the facts in proof amount to a payment of the bond, or otherwise present a legal bar to the right of the United States to recover on the instrument. It is expressly provided by statute that duties shall be payable only in the mon-

ey of the United States, that is, in the gold and silver coins of the United States, or in such foreign coins as are made current by law and are a legal tender in the payment of other debts (Laws U. S., Act March 2, 1799, c. 128, § 74 [1 Story's Laws. 635; 1 Stat. 680. c. 22]), or in the bills of the Bank of the United States (Act April, 1816). It is not pretended that a check drawn by a private merchant, on a banking corporation, comes within the words of the statute. Had it been presented for payment, and actually paid, this would without doubt have been payment of the bond; or if it had been carried to the credit of the collector, the bank being solvent. I do not think it could well be maintained that it was not payment of the bond. But this check was never presented for payment at the bank, nor payment of it demanded. But it is argued that a check, being a negotiable security, is held by the local law of the state to be a constructive payment. The principles of the local law that a negotiable security, given in consideration of a pre-existing debt, is presumed to be an extinguishment of that debt, is, as I understand it, confined to debts due on simple contract. Maneely v. McGee, 6 Mass. 143; Thacher v. Dinsmore, 5 Mass. 299. It does not apply to a debt secured by an instrument of a higher nature, as by bond. But I am not prepared to say that this rule of the local law, being a departure from the principles of the general law merchant of the country, would be applicable to a debt due to the United States, upon a contract made by their debtor directly with them, and that more especially when the positive injunctions of the statute just referred to are considered. But there is no doubt that a negotiable security is payment, when the creditor receives it as such (Sheely v. Mandeville, 6 Cranch [10 U. S.] 264), and the evidence in the case is such that a jury might easily infer that his check was taken in payment of the bond. That the deputy considered the bond as paid, is evident from his cancelling it. And the intention of the collector to extinguish the rights of the United States, under the bond, appears to be clearly indicated by his subsequent conduct. His keeping the check for so long a time without presenting it for payment, his afterwards exchanging it for a new security, and finally transferring this new security in pledge to a third person, a month or six weeks after the bond became due, all show that he considered the paper which he had taken as a satisfaction of the bond. If Mr. Swanton were himself the creditor, and had been acting for himself, it would be very difficult, on this demurrer, to render judgment in his favor. Swanton, however, was not acting for himself. He was merely an agent, acting in this business at least under a limited authority, and express and positive instructions. He had no authority to compromise or compound the debts of the United States, or exchange their securities. He was merely authorized to re-

ceive payment, and that in a way particularly pointed out, and his instructions must be presumed to be known to the defendants, as they were written in the public laws of the country. Admitting, then, that he would himself have been bound if it had been his own private debt, it by no means follows that he has bound his principal. When a man contracts with another, acting as the agent of some third person, he knows that he cannot bind his principal beyond the authority under which he acts. A prudent man will therefore ascertain the extent of his authority before he enters into the contract. The very fact that the person is acting under a derived authority, is a warning to him to inquire into its extent and limitation, and if he contracts without first ascertaining them, he does it at his own peril, for the principal may disavow the acts of his agent if they transcend his authority.

If the agent is intrusted to transact all the business of the principal, or all his business of a particular kind, or at a particular place, he is called a general agent, and in order to execute his agency he must necessarily be intrusted with a general authority to transact the business in the ordinary and authorized mode, and to bind his principal in all cases in which it is necessary to carry his agency into effect. Paley, Prin. & Ag. 162, 163. Whether a man, in any particular case has been constituted a general agent, is a question of fact, which may be established by direct proof, or inferred from circumstances. The fact being established, the presumption of law is that he has the authority to transact the business of his principal in the usual and customary mode in which such business is ordinarily transacted. It is on this presumption that the public trusts him, and his acts will bind his principal while he confines himself within the general scope of his agency, and they are free from fraud or collusion, although he may have acted in violation of his private instructions. 2 Kent, Comm. p. 484; Whitehead v. Tuckett, 15 East, 400. This presumption stands on plain and obvious reasons of public policy; it is a necessary principle to prevent fraud and encourage confidence in trade. Those who deal with such an agent, do it in reliance on his general authority, and they cannot be presumed to be acquainted with any private restrictions on this general authority. But if the knowledge of any such particular instructions is brought home to any individual who deals with him, the principal will not be bound unless the act of the agent is strictly within his authority. The force of the legal presumption yields to proof of the contrary. A special agent is one intrusted to do a particular act, or certain specified acts, and binds his employer only when he strictly pursues his power. It is the business of the party who deals with him to ascertain the extent of his authority, otherwise he trusts him at his own peril. 2 Kent, Comm. 484; Paley, Prin. &

Ag. 164. When a general agent acts under specific instructions, and these are brought home to the knowledge of the person who deals with him, then upon plain principles there can be no difference between his authority to bind his principal, and that of a special agent. And when these instructions are found in the general and public laws of the country, every person is presumed to be acquainted with them, and all the presumptions of law in favor of a general power are removed.

In the present case, therefore, the question which was discussed at the bar, whether a collector of the customs is to be considered a general or special agent of the United States, is wholly immaterial. In either case he was bound by his instructions, and these being as well known to the defendants as to himself, he cannot upon well-established principles, bind the United States beyond the precise limits of his power. These were, to receive in payment of the bond only such money as was a legal tender in payment of debts, or bills of the Bank of the United States. If, therefore, it was the intention of the parties that this check should be received as payment of the bond, it was an illegal intention, and not binding on the United States. It was in direct violation of a public law, which must be presumed to be known to both parties.

In the next place, it is said the deputy collector's receipt, acknowledging satisfaction of the debt, is a bar to any suit on the bond. A receipt does not operate as an estoppel to bar a right, without a satisfaction. It is merely evidence of payment, not conclusive, but always open to explanation or contradiction. Harden v. Gordon [Case No. 6,047]; Stackpole v. Arnold, 11 Mass. 32; Wilkinson v. Scott, 17 Mass. 257; Ensign v. Webster, 1 Johns. Cas. 145; Tobey v. Barber, 5 Johns. 68. A party denying its validity may always inquire into the consideration, and show what it in fact was, and impeach it on the ground of fraud, mistake, accident, or surprise. If the view which has been taken of the case is correct, the receipt can be no bar to this action. The consideration of the receipt was the check, and admitting that the collector received this as payment, as this was unauthorized and contrary to law, it is not binding on the United States. Whether the objection taken to it be fraud or mistake on the part of the collector or of his deputy, it is equally fatal. But it is said that the act of cancelling, by its own intrinsic virtue, annihilated the bond as a legal instrument, even if it was not paid, so that no action can be maintained upon it. The ancient doctrine certainly looks that way. The forms of pleading formerly rendered it necessary to make a profert of the deed, and without such profert the declaration was incurably defective. East India Co. v. Boddam, 9 Ves. 466. For so tenacious were the courts in former times of mere artificial and technical rules, which are professedly devised as subsidiary to justice, by promoting its regular and orderly administration, that the plainest claims of right were sacrificed rather than deviate from the forms of proceedings which had been sanctioned by long usage. If a bond was lost by time or accident, the obligee had no remedy at law, simply because no profert could be made of it; and if it were cancelled by fraud or mistake, it would seem also necessarily to follow, from this rule of pleading, that the remedy upon it would be gone, because, when produced, it would not support the declaration. The good sense of modern times has overcome this difficulty, and the obligee of a bond which has been accidentally lost or destroyed, can now recover upon it at law, as a good and subsisting obligation, without a profert. If the entire destruction of a bond does not present any insuperable obstacle to a recovery upon it, it will be difficult to show, by any rational and sensible distinction, why an action may not be maintained on a bond that has been cancelled, or from which the seal has been torn off, if it be shown that it was cancelled by fraud or mistake, without its having been paid or satisfied. The cancellation is certainly nothing more than the total destruction of the bond. If the collector, instead of cancelling this bond, had thrown it into the fire there would be no difficulty, on proof of the facts, in maintaining this action, as upon a lost bond; and why the remedy should be taken away, when instead of burning up the paper, he has, under the same state of facts, cancelled it by marks made with a pen, is more than I can reconcile with any principles of justice or common sense. In my opinion, no such absurdity can be imputed to the law. The cases of Cutts v. U. S. [Case No. 3,522], and U. S. v. Spalding [Id. 16,365], are conclusive to the point that the mere cancellation of the bond, if done animo cancellandi, will not destroy its validity. Neither of these cases were precisely like the case at bar. In the first, it was decided that a deed was not avoided by the seal being torn off by the obligor, whether he did it fraudulently or innocently; and in the latter, that if the obligee is induced to tear off the seal, or annul the bond, by the fraud or imposition of the obligor, the bond may still be declared on as a subsisting obligation. The mere fact of cancellation itself does not, therefore, annul the obligation of the bond. The circumstances under which it was cancelled may be inquired into, and these cases appear to me, in their spirit, to lead to the conclusion that a deed which has been cancelled by mistake or fraud, without being paid or otherwise satisfied, will support an action under the same circumstances as those upon which a recovery can be had on a bond lost or destroyed. My opinion on the whole case is, that judgment must be rendered for the plaintiffs.

## Case No. 16,725.

UNITED STATES ex rel. WHEELER v. WILLIAMSON.

[12 Leg. Int. 198, 199;[1] 3 Am. Law Reg. 729; 3 Liv. Law Mag. 595; 5 Pa. Law J. Rep. 365; 1 Quart. Law J. 70.]

District Court, E. D. Pennsylvania. July 27, 1855.

HABEAS CORPUS PROCEEDINGS—FUGITIVE SLAVES.

[On habeas corpus proceedings to obtain slaves who have been abducted from relator, one to whom the writ is addressed, and who both organized and supervised the abduction, is in contempt if his return merely denies that he had control at any time over the movements of the slaves, or that he knows their whereabouts; this being in effect false and evasive.]

[2] [On the 18th day of July last, the Hon. John H. Wheeler, U. S. minister to Nicaragua, made application to the United States court for this district for a writ of habeas corpus, to be directed to one Passmore Williamson. The petition of Mr. Wheeler, verified by affidavit, was presented by his counsel, Mr. J. C. Vandyke, district attorney of the United States. The court allowed the writ, which was made returnable forthwith, and a hearing appointed for the following day, (the 19th) at three o'clock in the afternoon. On the 19th, no return being made, and it appearing that the party to whom it was directed was absent from the city, Mr. Wheeler's counsel applied for an alias writ, which was allowed, and made returnable on the following morning at 10 o'clock. On the following morning, Williamson appeared in court, attended by his counsel, Messrs. Hopper, Gilpin and Birney, and the following return was drawn up in the presence of the court:

["To the Hon. John K. Kane, the Judge Within Named. Passmore Williamson, the defendant in the within writ mentioned, for return thereto, respectfully submits, that the within named Jane, Daniel and Isaiah, or by whatever names they may be called, nor either of them, are not now, nor was at the time of the issuing of the said writ, or the original writ, or at any other time, in the custody, power or possession of, nor confined, nor restrained their liberty by him the said Passmore Williamson. Therefore he cannot have the bodies of the said Jane, Daniel and Isaiah, or either of them, before your honor, as by the within writ he is commanded. P. Williamson.

["The above named Passmore Williamson being duly affirmed, says, that the facts in the above return set forth are true. P. Williamson.

["Affirmed and subscribed before me, this 20th day of July, A. D. 1855. Chas. F. Heazlitt, U. S. Commissioner."

[Mr. Vandyke briefly stated the facts of the case, and asked leave to traverse the return. The facts appear in the testimony

[1] [Reprinted from 12 Leg. Int. 198, 199, by permission.]
[2] [From 3 Am. Law Reg. 729.]

taken before the court. Mr. Hopper, one of the respondent's counsel, desired time to prepare testimony to prove the truth of the return, and asked for a continuance, for that purpose. The court could not agree to a continuance. If the facts were as stated by the counsel for the relator, there had been a cruel outrage of a criminal nature. Mr. Gilpin stated that the respondent wished to stand on the ground of utter negation of the possession of the servants at any time. No objection on the part of the respondent being made to the return being traversed orally, the counsel for the relator entered upon the examination of witnesses.

[John H. Wheeler, sworn: "I am a native of the state of North Carolina, and a citizen thereof. I am the owner of three colored persons, named Jane, Dan and Isaiah, and have been for some time; I hold them to labor under the laws of the state of North Carolina and of my country; I left Washington on Wednesday, the 18th; I was under orders from my government to proceed to the republic of Nicaragua forthwith; I have been the minister for one year, and had returned with a couple of treaties, and was upon my return to take passage from New York, in company with my three servants, whom I was taking to their mistress, who is now in Nicaragua. My wife is a native of Philadelphia, where I married her. I was forced to go to the residence of my father-in-law, Mr. Thomas Sully, to get some articles of Mrs. Wheeler's. I got a trunk from Mr. Sully's house containing these articles, proceeded to the wharf, but found the two o'clock boat gone. I had to wait until five o'clock for the next train. I spent the intervening time at the nearest hotel,—Bloodgood's, at Walnut street wharf. On going on board the boat at a little before five o'clock, I retired with my three servants to the hurricane deck to get out of the noise and bustle; shortly before five o'clock —the last bell had just rung, at five minutes before five—while I was reading the evening papers, an individual, whom I recognize as Mr. Passmore Williamson (looking at the respondent), came up to me and asked if he might speak to my servants. I replied that I could not imagine what business he could have with my servants, and that if he had anything to say I was the proper person to say it to; Mr. Williamson then pushed past me, and asked the woman (Jane) if 'she was a slave, and if she knew she was in a free country,' or something like it, and then, 'if they (the servants) would like to be free;' the woman replied that she knew with whom she was going, where and how she was going; the respondent then took her by the arm, and began to force her away; I interfered and said to Mr. Williamson, 'I wish you would go away.' Two colored fellows who had come up, then seized and held witness, and one of them said, 'if you make any resistance I will cut your

throat.' Do not know the proper names of the negroes who seized and held me; one of them is called Rabbit; by the interference of some gentleman, who seemed to be a traveller, the negroes released me, and I hurried down to the lower deck, and saw Williamson hurrying the woman off; and other colored persons with the boys, who were struggling to get away; went up to Williamson, and asked him what he was going to do with the woman; he answered that his name was Passmore Williamson that he could be found at Seventh and Arch streets, and that he would be responsible for any legal claim he (witness) might have on the slaves. By this time the colored persons with Mr. Williamson had got the servants off the wharf, and turning down the first street above the wharf (Front street) hurried them into a carriage which was standing about a square below Walnut street, in a large open space with large warehouses in it (Dock street); after the negroes had got off the boat, Mr. Williamson walked behind the crowd, and said something in a whisper to a large burly policeman, who was standing near. I spoke to the policeman in a whisper, asking him to observe the people who were committing the outrage, but the policeman refused to have anything to do with the matter, as 'he was not a slave-catcher.' " Cross-examined: "Mr. Williamson walked back with me from the carriage; he offered to write his name down, but I told him I could write it myself; he gave no directions to the driver; it was not a regular coach stand; there were no other carriages near; the people standing about the carriage, and who hurried the servants into it, were colored." Thomas Wallace, sworn: "I am an officer. I saw the occurrence on the avenue, but not on the boat; a crowd was coming down towards Dock street. I thought it was a fight, and went up; saw several negroes forcing along a colored woman, who was holding back with all her strength, and two boys, who were also struggling; they were all crying; four or five black fellows had the boys; they said they were slaves, whom they were taking away; the defendant was following the crowd; saw him do nothing but follow after the negroes; the negroes were pushing the woman and boys along; they all pulled back; I followed to Dock street, and saw the negroes put the woman and boys in a carriage; I knew the negroes; the defendant whispered to me, and said that they were slaves,—they were getting away,—and asked me to protect them; I said that I would have nothing to do with the matter." Robert T. Tumbleston, sworn: "I am a travelling agent between Philadelphia and New York; I was standing on the forward part of the boat, and saw a crowd; I went forward, and saw a colored woman and two boys being forced ashore by some colored men; I know two of the men, Custis and Ballard, who were very busy; they said the persons they had were slaves; Custis said to Mr. Wheeler, that if he interfered he would cut his throat from ear to ear; Custis had one of the boys in his arms; I followed a short distance, and then returned." William Edwards, sworn: "I take messages to the line and from it; I was on the wharf when this thing occurred; I saw two boys forced away by two colored men; the boy cried, and was struggling very hard to get away from those who held him; there were ten or fifteen negroes in the crowd." Capt. Andrew Heath, sworn: "Am in the employ of the Camden and Amboy Railroad Company; was on board of the boat; saw a negro bringing a small boy down the stairs of the boat; the boy cried murder; there were twelve or fifteen negroes forcing the woman and two boys along in a crowd; the boys and woman kicked and cried to get away from their assailants; they said they wanted to go with their master; I saw the defendant walking along with them."

[Mr. Vandyke rose, after the above testimony had been taken, and after remarking on the evidence and the return which had been made by the respondent, said that he had two motions to make: 1st. He moved for an attachment against the respondent, for contempt in making a false return to the writ. 2d. That he be held to bail in $5,000 to answer the charge of perjury.

[Mr. Gilpin asked whether the court would now hear the respondent on the question of contempt. He was instructed by his client to say, that evidence could be offered which would put a different complexion on the case.

[KANE, District Judge, said he would either hear counsel on the question as it now stands, or he would hear evidence for respondent.

[Mr. Hopper said the motion of the district attorney had taken himself and friends by surprise, and he would ask time for consideration.

[KANE, District Judge, said he understood that the respondent was willing to take the stand and swear that he had further evidence to offer. If the respondent would make oath that he had such evidence in prospect, the court would consider the application for a continuance.

[Passmore Williamson was then affirmed: "After the colored people left Dock street, in the carriage, I saw no more of them; I do not know where they are; have had no control over them, nor have I had any hand in their escape; my whole connection with the affair was this: I had heard that these three persons were in the city, and I felt anxious to inform them of their rights; for this purpose I went to Bloodgood's Hotel, where I saw a yellow boy; I asked him about the matter, and he told me where the party was; when I went upon the upper deck of the boat, I saw that man, (pointing to Mr. Wheeler); I approached the colored

woman, and asked her if she knew her rights, that by law she was free; Mr. W. asked me what I wanted. I told him my errand; he (Mr. W) kept interfering, and said she knew her rights and he did not want any interference with his affairs; Mr. W. reminded her of her children at home, and asked her if she wanted to leave them; she replied that she did not, but that she wanted to be free; Mr. Wheeler insisted that the woman did not want to go; there was an excitement, and the children cried. I saw them taken away; the object was secured of enabling them to act in accordance with their rights." Question by Mr. Vandyke: "Was it your object to take them from Mr. Wheeler? A.: "It was, if they desired." Cross-examined: "William Still, a colored man, first informed me of the matter; he laid upon my desk a note containing the facts; I told him to go to the wharf and attend to it, that I was going out of town; I afterwards altered my mind, and went to the boat; I was there before William Still; I do not know who engaged the carriage; I don't know who had hold of Mr. Wheeler; I told Mr. Wheeler I would be responsible to him for any damage his rights might sustain." Question by Mr. Vandyke: "Did you say his 'rights,' or his 'legal rights?' A.: "I do not recollect which I said. No man has rights that are not legal rights. I told Still to get the names if he could, and if they went to New York, we would telegraph there; he said there was nothing in the way of their remaining here, if they wished; I told him to hurry down to the wharf and see that their wishes were complied with. My first idea was to get out a writ of habeas corpus here, but as there was no judge in town, I thought it best to telegraph; I was afraid that as the boat was about starting, we would not have time to accomplish anything. Still said nothing to interfere; when I went down to the boat, I saw him talking to Mr. Wheeler; he is clerk at the Anti-Slavery office, in North Fifth street. Still was the only person on board I knew. I saw him this morning; we had a conversation respecting this case. We conversed as to the safety of the party; he said they were safe, and that they would not return under any circumstances; he did not tell me where they were. I am secretary of the active committee of the old Pennsylvania Anti-Slavery Society. Mr. Still did not tell me at what time the party returned. I do not know who got into the carriage. I saw it drive off."

[Mr. Vandyke contended that the respondent's testimony was no testimony at all. His statement was not sufficient to contradict the positive evidence of disinterested witnesses. It was apparent that these slaves were within the control of the respondent. The latter, the district attorney contended, had disposed of this property, and that he could reach it, if he felt disposed. The respondent was the ringleader in robbing the owner of his property. He then leaves town, and this morning, early, he has a conference with his companion in crime. Mr. Vandyke went on to argue that the return to the writ was not only an evasion, but an absolute falsehood, and that the parties were under the control of the respondent. He urged, in conclusion, that the respondent had not purged himself of contempt, and that he was liable for it and for perjury. The respondent's counsel, after consultation, determined to leave the matter to the court for decision, without argument.

[KANE, District Judge, said, that the case was of so grave a character, and the consequences so great to the defendant, that he was desirous, before pronouncing an opinion, to take time to consider and examine the matter. In the mean time, the defendant must enter bail in the sum of $5,000, on the motion to hold him for perjury, to appear on next Friday morning for a further hearing, at which time he would deliver an opinion upon the subject. The motion for an attachment for contempt will go over, and be disposed of at the same time.

[The court then adjourned.] [3]

Mr. Vandyke, U. S. Dist. Atty.
E. Hopper and C. Gilpin, for defendant.

KANE, District Judge. Col. John H. Wheeler, of North Carolina, the United States minister to Nicaragua, was on board of a steamboat, at one of the Delaware wharves, on his way from Washington to embark at New York for his post of duty. Three slaves, belonging to him, were sitting at his side on the upper deck. Just as the last signal bell was ringing, Passmore Williamson came up to the party—declared to the slaves that they were free—and forcibly pressing Mr. Wheeler aside, urged them to go ashore. He was followed by some dozen or twenty negroes, who by muscular strength carried the slaves to the adjoining pier; two of the slaves at least, if not all three, struggling to release themselves, and protesting their wish to remain with their master; two of the negro mob, in the meantime, grasping Col. Wheeler by the collar, and threatening to cut his throat if he made any resistance. The slaves were borne along to a hackney-coach that was in waiting, and were conveyed to some place of concealment; Mr. Williamson following and urging forward the mob, and giving his name and address to Col. Wheeler, with the declaration that he held himself responsible towards him for whatever might be his legal rights, but taking no personally active part in the abduction after he had left the deck. I allowed a writ of habeas corpus at the instance of Col. Wheeler, and subsequently an alias; and to this last, Mr. Williamson made

return, that the persons named in the writ, "nor either of them, are not now, nor was at the time of issuing of the writ, or the original writ, or at any other time, in the custody, power or possession of the respondent, nor by him confined or restrained; wherefore he cannot have the bodies," &c. At the hearing I allowed the relator to traverse this return; and several witnesses who were asked by him, testified to the facts as I have recited them. The district attorney, upon this state of facts, moved Mr. Williamson's commitment (1) for contempt in making a false return; (2) to take his trial for perjury. Mr. Williamson then took the stand to purge himself of contempt. He admitted the facts substantially as in proof before; made it plain that he had been an advisor of the project, and given to his confederates sanction throughout. He renewed his denial that he had control at any time over the movements of the slaves, or knew their present whereabouts. Such is the case, as it was before me on the hearing.

I cannot look upon this return otherwise than as illusory—in legal phrase, as evasive, if not false. It sets out that the alleged prisoners are not now, and have not been since the issue of the habeas corpus, in the custody, power or possession of the respondent; and in so far, it uses legally appropriate language for such a return. But it goes further, and by added words, gives an interpretation to that language essentially variant from its legal import. He denies that the prisoners were within his power, custody or possession at any time whatever. Now, the evidence of respectable, uncontradicted witnesses, and the admission of the respondent himself, establish the fact beyond controversy, that the prisoners were at one time within his power and control. He was the person by whose counsel the so-called rescue was devised. He gave the directions, and hastened to the pier to stimulate and supervise their execution. He was the spokesman and first actor after arriving there. Of all the parties to the act of violence, he was the only white man, the only citizen, the only individual having recognized political right, the only person whose social training could certainly interpret either his own duties or the rights of others under the constitution of the land.

It would be futile, and worse, to argue that he who has organized and guided, and headed a mob to effect the abduction and imprisonment of others—he in whose presence and by whose active influence the abduction and imprisonment have been brought about—might excuse himself from responsibility by the assertion that it was not his hand that made the unlawful assault, or that he never acted as the gaoler. He who unites with others to commit a crime shares with them all the legal liabilities that attend on its commission. He chooses his company, and adopts their acts.

This is the retributive law of all concerted crimes; and its argument applies with peculiar force to those cases in which redress and prevention of wrong are sought through the writ of habeas corpus. This, the great remedial process by which liberty is vindicated and restored, tolerates no language in the response which it calls for that can mask a subterfuge. The dearest interests of life, personal safety, domestic peace, social repose, all that man can value, or that is worth living for, are involved in this principle. The institutions of society would lose more than half their value, and courts of justice become impotent for protection, if the writ of habeas corpus could not compel the truth, full, direct, and unequivocal, in answer to its mandate. It will not do to say to the man, whose wife or whose daughter has been abducted: "I did not abduct her; she is not in my possession; I do not detain her, inasmuch as the assault was made by the hand of my subordinates, and I have foreborne to ask where they propose consummating the wrong."

Let Mr. Williamson, the respondent, be committed to the custody of the marshal without bail or mainprise, as for a contempt of the court in refusing to answer to the writ of habeas corpus, heretofore awarded against him at the relation of Mr. Wheeler.

District attorney asked for warrant of commitment under the seal of court. Granted.

Mr. Gilpin, for defendant, asked leave to amend the return so as to conform to the views of this court.